(C. D. 497)

ADOLPHE HURST & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 19, 1941)

*Eugene R. Pickrell* for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the defendant.

Before Brown and Tilson, Judges

Brown, Judge: This suit against the United States was brought at New York, and there tried, to recover certain customs duties alleged to have been illegally exacted upon a certain importation of a substance classified by the collector of customs under paragraph 1536 of the Tariff Act of 1930 as a manufacture of wax and assessed with duty at 20 per centum ad valorem.

The importers protested, claiming the merchandise to be duty free under paragraph 1796, Tariff Act of 1930, as Wax: Animal, vegetable, or mineral; or to be free under paragraph 1733 as "Oils, mineral * * * paraffin * * * not specially provided for," and dutiable under section 601 (c) (4), Revenue Act of 1932, as paraffin and other petroleum products, 1 cent per pound.

The only claim pressed was that under paragraph 1796 of the free list, which reads as follows:

Par. 1796. Wax: Animal, vegetable, or mineral, not specially provided for.

The merchandise was assessed under paragraph 1536, which reads as follows:

Par. 1536. Candles, 27½ per centum ad valorem; manufactures of amber, bladders, or wax, or of which these substances or any of them is the component material of chief value, not specially provided for, 20 per centum ad valorem.

The sole issue is whether the merchandise here involved is wax or a manufacture of wax.

The case was tried at New York on June 6, 1939. The official sample of the merchandise here involved was offered and, there being no objection, received in evidence as exhibit 1. Of this official sample, as was testified, a portion was taken each by Harvey A. Seil, called as a witness in behalf of the plaintiff, and Dwight A. Bartlett, called as a witness in behalf of the defendant, both being conceded to be qualified chemists. Chemical analyses were made of a portion of exhibit 1 by Messrs. Seil and Bartlett, respectively, the results of which, as testified to, are set forth as follows:

Analysis by Harvey A. Seil: (of Exhibit 1)

Began to melt at 52 degrees Centigrade, and was completely melted at 75 degrees Centigrade; acid number, 4.4; ester number, 39; saponification number, 43.4; iodine number, .3; glycerine combined, 2.6; fatty acids, 21.4; mean molecular weight, fatty acids, 370; ash, 1.05%; lime (calcium oxide), .8%. (R. p. 4).

Analysis by Dwight A. Bartlett: (of Exhibit 1)

Acid value of original wax was 4. The wax would not completely dissolve in xylol and alcohol mixture, and had a gelatinous precipitate. After boiling the wax with hydrocloric acid and washing out the hydrocloric acid the acid value had gone up to 20, and the saponification value on this acid wash was 59.8, the iodine value was 1.2, the melting point was 71.5, the specific gravity was .9375 at 20 over 20. It had an odor of montanwax, and the hydrocloric acid contained calcium. That was all that was done to the sample. (R. p. 15–16.)

The witness, Dr. Seil, testifying in behalf of the plaintiff, averred that, on the basis of his experience and education as a chemist, and based on his experience in the analyzing of waxes and based on his analytical work which he had performed on exhibit 1, the same was a wax, because it had the physical and chemical charateristics of a wax, it looked like a wax, and, furthermore, it had the chemical constituents to be expected in a wax. The witness further stated that it was a mineral wax because the unsaponifiable matter is a hydrocarbon, and the fatty acids obtained from this wax had a high molecular weight, and had the characteristics of an acid obtained from montan wax.

The witness, Dr. Seil, on cross-examination stated that he did not think that montan wax had glycerine; and when asked where the glycerine came from in exhibit 1, stated that he assumed the glycerine from its chemical behavior, that it might not have been glycerine, but that it was something combined with the fatty acids which on oxidation gave oxalic acid, and had reported that item in his analysis as glycerine combined and that it was there probably as an ester, though he did not think esters occurred in montan wax or mineral waxes; that he did not know whether the ester had been added or not but that its presence could be accounted for in various ways, one of which was by assuming the presence of glycerine, another, that some of the fatty acids or montan acids could have been esterified.

The witness further stated that the lime he found might have been in the wax as an impurity; that it might have been hooked chemically in part and that the lime could have been there as soap, but that he had never heard of adding lime soap to give the characteristics of wax.

On recross-examination the witness, Dr. Seil, testified that if the lime was in the wax as soap, that is combined with the fatty acids to form a soap, he could estimate only approximately how much soap there would be, as he thought that but half of the acids would combine with the lime as there was not enough lime to do more, and the result, approximately, as he estimated it, would be about 10 per centum of soap.

Dwight A. Bartlett, witness, called in behalf of the defendant, testified that he was a chemist (qualifications as such conceded by plaintiff's attorney) and had acted as chemist in Government employ since 1908 and had analyzed approximately two hundred samples of wax; that he had analyzed a part of exhibit 1 with the result as set forth above. The witness testified that the presence of calcium in the sample indicated the presence of calcium soap, especially as the acid value of the original sample, which was 4, on being treated with acid went up to 20, showing that the lime had been combined with the wax acids; also the insolubility in xylol and alcohol was another indi-

cation that the gelatinous looking substance indicated that the calcium was combined there as a soap, that is what is called soap in chemistry, and was not free lime; and that led him to the conclusion the wax was not a natural wax, and that it had had something done to it since it was taken from the original source.

Over the objection of plaintiff's counsel, who took exception, the witness, Dr. Bartlett, was allowed to testify that as part of his duties as chemist he made an advisory classification of the merchandise here involved and had made his report as usual and had said in that report that the sample was a manufacture of wax, similar to the merchandise the subject of Abstract 33765; that it contained wax and the calcium salts of montan wax acid; and that that report indicated, on his knowledge and experience as a chemist and upon the analysis which he had made of exhibit 1, his conclusion as to what exhibit 1 was.

Over objection of plaintiff's counsel, with exception taken, the witness, Dr. Bartlett, was allowed to testify that he had made a much more complete analysis on the sample submitted under Abstract 33765, and that the two were similar, very similar, but not identical; and that the soap found in exhibit 1 in the instant case was not there naturally but had been added. When asked on cross-examination why he was of the opinion that the soap had been added, the witness replied that in all the montan waxes he had analyzed he had never found a lime soap there as a natural constituent. When asked how much lime he had found he replied:

A. I did not; as I say I made a more complete analysis on the old. (R. p. 22)

The witness was of the opinion that even so small a quantity as 8/10 of 1 per centum of lime could not have been present as an impurity, and witness further testified that he had made no quantitative analysis for the amount of lime nor in any other particular. This led to a discussion as to chemical terms and methods and as to how much of the witness' analysis was based on inference or hypothesis. The witness further testified that the product here was a wax and had the odor of montan wax acid which was obtained from montan wax, which in turn was of mineral origin.

Dr. Bartlett further testified that as lime was not a mineral but a chemical, though derived from limestone, the lime content of the wax here involved was not of mineral origin, but that the remainder was of mineral origin.

From the record before us we find the following as facts proven by the testimony of the two opposing chemists or uncontradicted:

(1) The substance here in controversy as represented by exhibit 1 was sold by the importer to his customers in the United States as wax to be used in making various manufactured articles.

(2) The substance has a lime content, amounting to 8/1000 of the whole, manifesting itself in the form of what was chemically designated calcium soap in an estimated amount of 10 per centum of the whole, which soap was the result of the combining of the lime with some of the fatty acids..

(3) The substance here, despite the 10 per centum of calcium soap present as the result of the lime content, whether as an impurity or added, is a wax.

(4) This wax, except possibly as to the 10 per centum of calcium soap, is of mineral origin.

The two points on which the two opposing chemists differed are in our opinion of no materiality. The two points of variance are as follows:

(a) Was the lime content, amounting to 8/1000 of the whole present as an impurity or was it added?

(b) Was the resulting calcium soap, in the estimated amount of 10 per centum of the whole of mineral or other origin?

Question (a) is disposed of by our finding (3) above, as both the opposing chemists agree that however the lime content came into the original wax it remained a wax. Therefore the presence of the lime content could not have constituted a process of manufacture that converted the wax into something else, namely, a manufacture of wax, as classified by the collector.

As to question (b), it seems perfectly clear that when the Congress phrased the language of the paragraph as it did:

Wax: Animal, vegetable, or mineral, not specially provided for.

the Congress used a common form of expression denoting the division of all mundane physical matter, and in so using that common form of expression the Congress used it as commonly understood, to be all-inclusive. The language which the Congress employed has exactly the same meaning as though the wording had been

Wax: Not specially provided for, or

All Wax; Not specially provided for, or

All Wax; From whatever source derived, not specially provided for.

It seems clear, therefore, that the estimated 10 per centum of calcium soap, the result of the lime content which is admittedly derived from limestone clearly brings it within the intent of Congress to include it in the mineral division, one of the divisions into which all physical matter is commonly divided. We so hold, and find that the merchandise covered by the protest herein, as represented by exhibit 1, is wax, of mineral origin, classifiable under paragraph 1796 of the Tariff Act of 1930, and therefore duty free.

Judgment will issue accordingly.

We have arrived at the above decision from the study of the testimony in the case at bar, but we find that counsel on both sides have cited a number of decisions of this court in previous cases on much the same issue wherein contrary decisions were arrived at. Had the testimony in the present case left us in doubt a study and discussion of these cited cases would have been in order. In the present instance we think it will be sufficient to examine and discuss the decisions cited by and apparently relied on by counsel for the defendant.

In the case of *American Cyanamid & Chemical Co.* v. *United States*, Abstract 33765, 69 Treas. Dec. 1237, where the merchandise was classified as a manufacture of wax and claimed to be duty free as wax there was precisely the same issue presented as here. A chemical analysis was submitted by the Government and constituted all the testimony in that case. There was no oral testimony, as in the instant case, to point out to the court that that analysis was an analysis of wax, and there were no briefs to aid the court. It is evident from the opinion by McClelland, P. J., that the analysis had no meaning for him as evidence overcoming the presumption of correctness of the collector's action, and the decision that the merchandise in controversy was a manufacture of wax was based solely on that presumption of correctness on the part of the collector. Such a decision cannot be considered as controlling in the instant case, where Dr. Bartlett, who made the analysis in Abstract 33765 and also one in the instant case, testified after thorough examination and cross-examination that the substance here involved was wax.

In *Tidewater Oil Co.* v. *United States*, 171 U. S. 216, there appears the following passage in the opinion which is underscored by the counsel for the Government in the instant case, presumably for the purpose of indicating that the testimony of Dr. Bartlett that in the instant case something had been added to the wax or done to it, was proof that the wax here had undergone a process of manufacturing:

*Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product.*

In that case the issue was whether certain boxes on which drawback had been claimed were wholly manufactured in this country. The manufacturing consisted in nailing together as boxes certain shooks which had previously been shaped and cut to size in Canada, and the Supreme Court affirmed the court below in denying the drawback on the ground that the shooks had undergone a process of manufacture before entering this country. Here we have no such testimony. Dr. Bartlett, who testified that he thought something had been added or done to the natural wax, also testified that the substance represented by exhibit 1 was wax.