ADOLPHE HURST & CO., INC. *v.* UNITED STATES (No. 4499)[1]

United States Court of Customs and Patent Appeals, January 4, 1946

*Eugene R. Pickrell* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

[Oral argument October 2, 1945, by Mr. Pickrell and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

Appellant here seeks reversal of the judgment (C. D. 897) rendered by the United States Customs Court (First Division) denying its

[1] C. A. D. 322.

claim, presented by protest, that certain imported substances invoiced as waxes entered at the port of New York during the year 1939 should have been classified under paragraph 1796 of the Tariff Act of 1930 and, therefore, admitted free of customs duties. The decision of the trial court states:

There are two kinds of merchandise involved, one invoiced as Dura Wax No. 1 and the other as Dura Wax No. 3. Although the chemical constituents of the two are the same, the percentages thereof are somewhat different in each case, but there appears to be no dispute that such differences are immaterial from the tariff classification standpoint, and the same principles of decision will therefore be applied to both.

The merchandise was classified by the collector as a manufacture of wax, under paragraph 1536 of the Tariff Act of 1930, duty being assessed at the rate of 20 per centum ad valorem.

Appellant's protest embraced alternative claims, one being for classification under paragraph 1558 of the act, and the trial court held it so classifiable, but the duty rate under that paragraph being the same as the rate under paragraph 1536 appellant, of course, was not entitled under the judgment to recover any part of the monies which it had paid. So, the instant appeal was taken seeking a ruling sustaining its primary claim for free entry. It is conceded, in effect, by counsel for the Government that, under judicial decisions hereinafter cited, the collector's classification under paragraph 1536 was erroneous and their contention is that the holding of the trial court fixing classification under paragraph 1558 should be affirmed.

Therefore, the issue, as the case is presented to us, is limited to paragraphs 1558 and 1796. These read:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1796. Wax: Animal, vegetable, or mineral, not specially provided for.

The first sentence of the decision of the trial court (rendered November 23, 1944) reads:

This case is in its essence a retrial of the issues involved in the case of *Adolphe Hurst & Co., Inc.* v. *United States*, 6 Cust. Ct. 364, C. D. 497, the record in which was incorporated as part of the record herein.

With respect to the above statement we may point out that in that case the issue seems to have been solely between paragraphs 1536 and 1796, respectively. The protest in the case is not before us, except as it is paraphrased in the court's decision and we do not find in such paraphrase, or in the decision itself, any reference to paragraph 1558. The brief on behalf of the Government in the instant case states that in that case it was "the claim of the Government that it [the mer-

chandise] was a manufacture of wax." That case was decided May 19, 1941, by the First Division of the Customs Court, the judges composing such division at that time being different from those composing it at the time the decision in the instant case was rendered. The trial court there sustained the claim for classification under paragraph 1796, adjudging the merchandise entitled to free entry. No appeal was taken from the judgment so rendered, and presumably the duties which had been paid were refunded to the importer.

In the instant case the trial tribunal did not follow the "free entry" ruling in the former case (although the merchandise in the two cases is conceded to have been substantially identical in character), but held as has been recited, an express holding being made that the classification of the collector under paragraph 1536 was erroneous. In ruling that it was erroneous and in the further holding that the merchandise was properly classifiable under paragraph 1558 as a non-enumerated manufactured article the court cited as controlling the decision of this court rendered May 5, 1941 (which it will be observed was some two weeks prior to the decision in the former *Hurst & Co.* case, *supra*) in the case of *United States* v. *General Dyestuff Corporation*, 29 C. C. P. A. (Customs) 53, C. A. D. 170. With respect to the decision so cited, the trial court said, *inter alia:*

There the court had before it a material, known as I. G. Wax Z, which had been processed from montan wax to a condition in which it possessed uses not possessed by the original montan wax, but which was still suitable for use only as a wax material.

The merchandise before us likewise is suitable for use only as a wax material. Because of a high melting point, a higher degree of waterproofness, and higher emulsifiability, it appears to be more suitable for certain purposes, such as the manufacture of polish, cosmetics, insulation, etc., than natural waxes. These are, however, uses of wax as a material.

In holding that I. G. Wax Z was not dutiable under the provision for manufactures of wax, the court pointed out that it was a wax material which had been manufactured into another kind of wax material, and had not been manufactured into a completed article, thus distinguishing between such manufacture as would constitute some change, i. e., advancement, in the material but which still leaves it only a material and such as would constitute its transformation into a new article.

To the above it may be added that the merchandise involved in that case was imported during the year 1938; that it was classified by the collector under paragraph 1536; that the protest embraced alternative claims; that the trial court (which was the First Division, the judges being the same as those who decided the first *Hurst & Co.* case, *supra*) rendered its decision May 16, 1940 (C. D. 337) sustaining the claim for free entry, the issue being treated as relating solely to paragraphs 1536 and 1796, and that we reversed the judgment without approving the collector's classification, expressing the view that the merchandise was properly classifiable under paragraph 1558.

In the course of our decision there we discussed at some length, citing authorities, the distinction in customs law between a thing manufactured and the manufacture of a thing. Such discussion was in connection with paragraphs 1536 and 1558, and, since paragraph 1536 has been eliminated from consideration in the instant case, we need not here repeat that discussion.

As heretofore indicated, we are not here called upon to consider classification under any paragraphs other than paragraphs 1558 and 1796, respectively.

As stated by the trial court, the testimony taken in the prior case of *Adolphe Hurst & Co.* v. *United States* (which involved protest 970568–G, the protest in this case being 19738–K) was, by consent, incorporated in and made a part of the record in the instant case, and certain additional testimony was taken. There were also placed in evidence as Exhibits 1 and 2, respectively, samples of the merchandise to which references were made by different of the witnesses, Exhibit 1 being representative of Dura Wax No. 1, and Exhibit 2 of Dura Wax No. 3, and, on the part of the Government, there was introduced in evidence as Exhibit 10, a patent (No. 1,834,056 issued December 1, 1931), example 4 in which is claimed to show "the method of preparing such a product as the involved Durawax." Various other exhibits were introduced in evidence which need not be particularly described.

It may be said at this point that there is no contention here that there is any distinction between Dura Wax No. 1 and Dura Wax No. 3, so far as their classification for customs purposes is concerned. Also, it appears that the waxes here involved are very similar to those involved in the prior *Hurst & Co.* case, *supra*. Indeed, as we understand it, Exhibit 1 was first introduced in evidence in that case. Further, it seems to be agreed that the Dura Waxes here involved differ in certain respects from the so-called I. G. Wax, involved in the *General Dyestuff Corporation* case, *supra*, and appellant contends that those differences are such that that case is not here controlling, and cites certain decisions of this and other courts to which reference is hereinafter made.

The record (including, of course, the incorporated record) embraces the testimony of two witnesses called on behalf of appellant and that of three called on behalf of the Government. One of appellant's witnesses and all of those called by the Government were chemists whose qualifications were conceded by counsel for the respective parties. Except as to what may be designated as "opinion evidence," we find no material discrepancy in the testimony respecting the composition of the substances involved, and under the view which we take of the case it is not deemed necessary to set forth the testimony in minute detail.

The basic, or "starting," material of the substance is montan (mineral) wax derived from lignite, similar to the basic substance of the wax involved in the *General Dyestuff Corp.* case, *supra*. That it received treatment before importation which changed its character to some extent from that of a simple montan wax does not seem to be seriously controverted. We think the evidence supports the Government's contention that as imported the merchandise shows the presence of calcium soap and beta butylene glycol in ester form—substances which are not natural constituents of montan wax and which must have been added in the treatment of the montan wax.

The trial court said:

' We think the conclusion is justified from the evidence that the merchandise at bar is not wholly a natural wax for the reasons that it contains chemical elements and compounds not found in any natural wax, and that it has chemical and physical properties not present in any single natural wax.

From our examination of the testimony we feel constrained to agree with the above statement as a finding of fact.

We think it is also fairly established by the evidence that, as a result of the processing, the substance involved was advanced to a condition which fitted it for uses to which the basic or starting material was not adapted. The testimony of the Government's witness, Dr. Bartlett, is to the effect that the addition of the calcium soap raised the melting point of the original montan wax from 62.5° to 96° C. Another witness, Dr. Bowles, testified, in substance, that it not only raised the melting point but that it tended to produce waterproofness and increase emulsifiability, and that the esterification of the fatty acid with butylene glycol would also increase emulsifiability. The testimony of the third witness for the Government, Dr. Eckweiler, who followed the method defined in the patent (Exhibit 10) in an experiment made by him is in harmony with that of Drs. Bartlett and Bowles.

There was no rebuttal of the testimony of those witnesses, and it does not seem to be in conflict with anything said by Dr. Seil, the chemist who was called as a witness for the importer, although the latter, in effect, expressed the opinion (testifying as to Exhibit 1) that it is a wax meaning, we assume, that it is such a wax as is provided for in paragraph 1796, *supra*.

Appellant's witness, Ernest Stein (not shown to be a chemist), vice president of the importing company, testified to the effect that the imported material is sold, under the trade name of "Adurco" wax to manufacturers of rubber repair goods, manufacturers of lipsticks and cosmetics, manufacturers of shoe polishes and furniture polishes and to manufacturers of insulated wires and cables; that it is sold for use as a wax; that "Wax is bought and sold on specifications covering

melting point, acid number, saponification number, ester number, and iodine value"; that the "melting point is about 80 degrees Centigrade and the acid value 4 to 5," and expressed the opinion that the involved merchandise "is a wax because it is bought and sold as a wax."

As we understand the testimony of the Government witnesses, particularly that of ·Dr. Bowles, the treatment given the natural montan wax before importation advanced it to the stage or condition which fitted it· for the uses for which Mr. Stein said it was sold to manufacturers—that is to say, before importation it had been so processed that it was fitted to uses to which untreated montan wax is not adaptable.

In the *General· Dyestuff Corp.* case, *supra*, we found that the "I. G. WAX Z" there involved was a substance which by the treatment of montan wax had been fitted, before importation, "for highly specialized uses, for which uses it was not suitable in its original condition as montan wax," and various of the specialized uses were recited. Those uses need not be repeated in detail here, because we are satisfied that there is no distinction in principle between that case and the case at bar, and that if the decision in that case is to be followed the judgment here appealed from should be affirmed.

However, a majority of the four judges of this court who participated in the decision of that case (Judge I. L. Lenroot, a member of the court at that time, did not participate) have after a restudy of the facts and issues involved reached the conclusion that the decision there was erroneous and that the error should not be perpetuated by following it here.

It is proper to state at this point, in fairness to the trial court, that it properly relied upon our decision in that case, and it is with great regret that we feel constrained to reverse the judgment before us.

In the course of our decision in the *General Dyestuff Corp.* case, *supra*, in which we held that the "I. G. WAX Z," there involved, was not the kind of wax intended by the Congress to be covered by paragraph 1796, *supra*, but that it was dutiable under paragraph 1558, *supra* (it being also held that the treatment which it had undergone before importation had not converted the wax from a mere material into a manufacture of wax within the purview of paragraph 1536 of the 1930 act, which paragraph is not involved here), we said *inter alia:*

\* \* \* It [the wax] is still a material, though a manufactured one, which has passed from its state as montan wax, in which state it would be classifiable under the free list provision for mineral wax, into such a different material as to no longer, in our judgment, respond to the term "mineral wax" found in said paragraph [1796]. While it is waxy in character, it is a material, and, as its name and use indicates, it is a wax which has been so processed and manufactured that its original nature and wax characteristics have been greatly altered and changed. The wax at bar has been bleached. It has been reduced with iron powder and has been run over a nickel catalyst, in which processes the oxygen has been

removed and hydrogen added. These processes have transformed it into a new material with new uses for which the original material, montan wax, was not suitable.

\* \* \* \* \* \* \*

In our judgment, however, the instant material is still a material which may be used for making manufactures of wax responding to the language of the dutiable provision, paragraph 1536 \* \* \*

and quoted the following from volume 2, pp. 2636–2639, of the Summary of Tariff Information, 1929:

DESCRIPTION AND USES.—Beeswax is described under paragraph 1438 which provides for white bleached beeswax. The crude beeswax enters under paragraph 1693. The waxes of this paragraph are substances which in physical properties · resemble beeswax and are mixtures of compounds containing carbon, hydrogen, and oxygen. Vegetable waxes are obtained from the fruit, leaves, or stems of many plants, a small number only being of commercial value. The principal vegetable waxes are carnauba, candelilla, Japan wax, myrtle or bayberry, and Cochin China or caycay. Chinese or insect wax, though classed as vegetable, is really an animal wax. The mineral waxes, similar to paraffin (par. 1633), come from natural bituminous substances; the most important are ceresin and montan.

\* \* \* \* \* \* \*

Montan wax is obtained by extraction from certain lignites found in Saxony and Thuringia. The crude wax is brown in color, but by distillation with super-heated steam may be obtained nearly white. It is also refined with sulphuric or nitric acid. It is used as a substitute for carnauba wax in polishes; in place of ceresin in insulating materials; for phonograph records; and, mixed with tar, for waterproofing roofs. Its property of raising the melting point of low melting point waxes is of importance and it is accordingly used as an addition to paraffin and other waxes to offset their low melting points. It is also used in the treating of paper instead of rosin and as a substitute for or in combination with creosote for wood preservation.

\* \* \* \* \* \* \*

*Mineral wax* to which stearic acid had been added was held dutiable at 20 per cent as a nonenumerated manufactured article under paragraph 1459 rather than free as wax under paragraph 1693. (T. D. 41814.)

It will be observed from the above quoted excerpt that we there stated that the manufacturing processes to which the montan wax had been subjected produced "such a different material as to no longer, in our judgment, respond to the term 'mineral Wax' found in said paragraph [1796]."

While not expressly so stated, the above last quoted holding was predicated upon the assumption that the Congress intended to limit the provisions of paragraph 1796, *supra*, to crude wax or wax in its natural state. Upon a restudy of the Summary of Tariff Information we fail to find anything therein (and we find nothing elsewhere) which indicates that Congress intended to make such limitation. It appears from the Summary of Tariff Information that montan wax in its crude form is brown in color, and that "by distillation with super-

heated steam [it].may be obtained nearly white. It. is also refined with sulphuric or nitric acid." There is nothing in the quoted statement to indicate that it had occurred to either the Tariff Commission or the Congress that bleached and refined montan wax was not wax and not free of duty as such under paragraph 1796, *supra*.

It will be observed from the quoted excerpt from the Summary of Tariff Information, *supra*, that the attention of the Congress was called to the fact that white bleached beeswax was specially provided for under paragraph 1458 of the Tariff Act of 1922. It was dutiable under that paragraph at 25 per centum ad valorem. Bleached beeswax is also specially provided for under paragraph 1556 of the Tariff Act of 1930 at 30 per centum ad valorem.

It is evident, we think, that the Congress was cognizant of the fact that unless specially provided for, bleached beeswax would be free of duty under paragraph 1796, *supra*.

In giving consideration to these matters, it may be borne in mind that in the *General·Dyestuff Corp.* case, *supra*, we held that, although the wax there involved had highly specialized uses owing to the processes to which montan wax had been subjected, it was, nevertheless, a mere material and had not been converted by such processes into a new and different article having a new name, character, or use.

Whenever, in enacting tariff statutes, the Congress has seen fit to limit a provision to substances in their crude or natural state it has made its intention plain by the use of such expressions as "crude," "in its natural state," or "not advanced in value or condition," etc. It is unnecessary that we here enumerate the paragraphs in the Tariff Act of 1930 which are illustrative of that fact. The Congress not having limited paragraph 1796, *supra*, to "Wax, Animal, vegetable, or mineral," in the crude or natural state of the wax, we are of opinion that wax, such as that at bar, which has been advanced in value or condition by manufacturing processes, but which is still wax and suitable for use as a material and which has not been converted into a new article having a new name, character, or use, and is not otherwise specially provided for, is not precluded from free entry under paragraph 1796, *supra*, merely because it is not in its crude or natural state.

In the case of *P. Beiersdorf & Co., Inc.* v. *United States*, 31 C. C. P. A. (Customs) 158, C. A. D. 267, decided February 7, 1944, we held that wax produced from wool grease or lanolin was free of duty under paragraph 1796, *supra*, as animal wax. We there held that that paragraph was not limited to natural wax, but that it included wax produced by manufacturing processes from other substances. It is not intended to suggest that our decision in that case is controlling here but we cite it as disclosing the view then and now entertained that paragraph 1796, *supra*, is not limited to natural wax.

Since the wax involved in the *General Dyestuff Corp.* case, *supra,* was a wax suitable for use as such, we are now of opinion that it should have been held classifiable under paragraph 1796, *supra,* and that we should not here follow the decision there rendered.

For the reasons stated, we hold the merchandise here involved classifiable under paragraph 1796 of the Tariff Act of 1930 and entitled to free entry.

Accordingly, the judgment of the United States Customs Court is *reversed* and the cause *remanded* for further proceedings in conformity with this decision.

O'CONNELL, J., concurs in the conclusion.

### DISSENTING OPINION

BLAND, Judge: The majority, I think erroneously, conclude that our holding in the *General Dyestuff Corporation* case that the importation there involved was more than a wax and was a manufactured article (cited with approval by the entire court in *United States* v. *Nippon Co. et al.,* 32 C. C. P. A. (Customs) 164, 172, C. A. D. 303) was unsound for what I regard as insufficient reasons.

Before considering the questions of law involved, it is highly important to more carefully consider the nature of the imported article at bar, the manner in which it is manufactured, and the uses to which it is applied. If it is a wax to be classified under the free list provision it should be either as an animal, a vegetable, or a mineral wax. It is not sufficient to merely hold that it is a wax.

While some of the stipulated testimony of the chemists states that it is a wax by reason of the fact that it is sold as such and has some of the characteristics and uses of known waxes, the record is certainly not conclusive that the chemists concluded that it was a wax at all, and particularly they did not conclude it was any one of the three kinds of free list waxes. An analysis of the statements of the witnesses conclusively shows, in my opinion, that it is something that has been manufactured from a wax and which is neither animal, vegetable, or mineral.

A chemist, Dwight A. Bartlett, stated that:

I found that Exhibit 1 is a mixture of approximately 35% of calcium salts of fatty acids, commonly called lime soap, with 65% double bleached montan wax whose fatty acids have been esterified with beta butylene glycol. * * *

Exhibit 2 contains approximately 15% of the calcium salts of fatty acids or lime soap, and the balance is bleached montan wax whose acids have been esterified with beta butylene glycol. * * *

Calcium is not a natural constituent of montan wax. I believe it has been added and that the calcium has combined with the free fatty acids in the montan wax to form a fatty acid salt of calcium, which is a chemical reaction, and I believe it has been brought about by an act of man and not a natural phenomenon.

Herbert W. Eckweiler testified in part as follows:

Montanic acid is bought and sold as a wax, but I would not otherwise consider it to be a wax. Montan wax itself consists of something other than montanic acid, and in producing montanic acid, montan wax is subjected to chemical treatment and chemical reactions take place. * * *

I consider Exhibit 1 a manufactured wax. If I had never seen the material before, and made no analysis of it, I would say it was a wax. There are a lot of things which are waxlike, for example, stearic acid, has many of the properties of a wax, but I couldn't say it was a wax. My definition of a wax is a product which is found in nature with very divergent chemical and physical characteristics, all used as the first waxes were used.

Frank A. Bowles testified in part as follows:

Exhibits 1 and 2 might be used for extreme pressure lubrications, journal compounds, driving journal compounds, floor polishes. boot blackening, in various types of wiring, to produce a waterproofness. The formation of soaps with lime and esterification with beta butylene glycol is a chemical process. * * *

I should define a wax as an organic ester of high molecular weight obtained from nature, the chemical properties and constants of which are not altered in the commonly known and accepted refining methods. * * *

I know of no natural waxes that have approximately the properties of Exhibits 1 and 2. There are some that have melting points within that range, and there are natural waxes which have the appearance of Exhibits 1 and 2, but appearance is not always the property that is desired or sought in compounding various materials for which the waxes are used. There are natural waxes which have the same feeling as Exhibits 1 and 2 approximately, and there are natural waxes which are used as polishing compounds in the same manner as Exhibits 1 and 2. The consistency of the material and the use to which it is put are not the real tests of whether the material is or is not a wax. A wax is distinguished by its analysis, by its physical constants and chemical constants, as distinguished from manufacturing products which we make to contain those constants that we wish it to have. Various waxes have various compositions. You would not compare beeswax with Carnauba wax in most of its chemical and physical properties. They are both natural waxes. We can make a beeswax having properties entirely different from beeswax by taking the ceryl alcohol or ceric acid contained therein, and manufacturing other products from them to have different properties. *It would be substantially a product derived from beeswax, but manufactured.* There are a good many substances that we commonly call waxes that are not, chemically, waxes. [Italics added.]

Ernest B. Stein, vice president of the importing company, said that the importation was sold "as Adurco wax—a trade name." He further stated that:

It is sold to manufacturers of rubber repair goods, manufacturers of lipsticks and cosmetics, manufacturers of shoe polishes and furniture polishes, and to manufacturers of insulated wires and cables. It is sold for use as a wax, and based on my experience it is a wax because it is bought and sold as a wax.

Dwight A. Bartlett also stated that lime had been added since the material was taken from its original source and that:

This importation would be of mineral origin exclusive of the lime soap. *Lime is not a mineral, but a chemical obtained from limestone.* [Italics mine.]

The foregoing partial statement of the record relating to the nature and characteristics of the importation illustrates how far from wax a commercial manufactured article sold as a wax may be processed from a wax. Particularly it shows that the montan wax, whether bleached or purified or not, is a mineral wax and that the instant importation, if a wax at all (which it is not) is a mixed wax for which there is no provision under the free list. Suppose a substantial quantity of beeswax (an animal wax) or japan wax (a vegetable wax) had been added to obtain certain results, could it be said to be a mineral wax?

The only reasons that I can find from the majority opinion as to why they conclude that the instant material is a wax are:

First, because it has some of the uses of natural wax and is sold as a wax; and,

Second, because they found nothing in the legislative history or elsewhere that indicated that Congress intended to limit the free list paragraph to *crude waxes*.

There need be no controversy about the second conclusion because the legislative history shows that Congress did not intend that the free list paragraph be limited only to a wax in its crudest form. The provision without the word "crude" was inserted in a tariff act for the first time in 1922. When the bill was introduced into, reported, and passed by the House of Representatives, the paragraph contained the word "crude." On the floor of the Senate the word "crude" was stricken from the paragraph. The reason for this was obvious. Montan wax in its original brown crude state had been going through a bleaching and purifying process abroad. These processes did not involve adding anything to the wax but took something out of it. Congress sought to prevent the word "crude" from barring from free entry such waxes as montan wax which had been bleached and to some extent purified. In its purified and bleached state it contained all of its original desirable characteristics and uses in a more compact form.

The instant importation is not a bleached or purified montan wax but an article which by manufacturing efforts has been advanced to a manufactured article. The testimony of the chemists and everything connected with the case, in my judgment, point to the fact that the meagre reasons assigned by the majority, which are not very definitely expressed, why the instant material must be regarded as a mineral wax are insufficient.

It must be remembered that it is not disputed that a chemical reaction has taken place, that materials foreign from those which are found in montan wax or any other animal, vegetable or mineral wax have been added in large quantities for the purpose of making a new article for uses for which a bleached or purified montan wax was unsuit-

able. While it is in part of wax the addition of substances and the chemical changes brought about gave it a new texture and fitted it for new uses not theretofore common to the waxes of commerce.

Flour may be manufactured into dough. It is no longer flour. The dough may be made into bread, but certainly neither the bread nor the dough should be regarded as flour. When you take a known wax and chemically mix it with substances foreign to its nature for the purpose of making it fit into new uses foreign from the uses it originally possessed and submit it to chemical processes other than those of bleaching and purifying it, it would seem clear that a manufactured article had emanated.

A wax may be produced synthetically and come within the free list paragraph but a synthetically produced wax which has subsequently been manufactured by the steps which were applied in the instant case ceases to be a synthetic wax but a manufactured article made in part from wax. Where would the majority draw the limit on the kind of waxes entitled to free entry? How far could a foreign manufacturer go in adding new materials giving new characteristics and uses to natural waxes? Can it be said that as long as it is waxy in appearance and that it had some of the uses of wax or some of the chemical elements of natural wax left in it it would still be a wax? It would still be waxy as putty is waxy if its inherent characteristics were far more changed than they are in the present instance and it could be sold as a wax and it might have some of the uses of a wax, but if an abrasive was put in it fitting it for a wholly new use than we now have in mind, or if some other material was added that we do not think of now but may be thought of later which gives it a new characteristic and new use, are we still going to say that it is still a free list wax? For instance, montan wax is in this country mixed with tar and used in making roofing waterproof (Summary of Tariff Information, 1929, p. 2638). *Quaere:* Is a wax-tar mixture for reasons stated by the majority to be held free of duty? We are big tar producers. The wax question, in view of its many new uses and increasing importations—tens of millions of pounds per annum—is not an unimportant one.

Sealing wax is waxy and has a wax use, but it is not a wax. In T. D. 25595, sealing wax composed of *resins* and *chemicals* was held not to be a wax under the tariff act of 1897 which provided for *vegetable* and *mineral* waxes. That case illustrates that everything that is waxy and which is sold and used as a wax is not a wax, and further supports the contention herein that a mixture of a mineral wax with something that is not a mineral is not a mineral wax.

If it were not for the fact that the word "crude" was stricken out of the bill in the Senate as hereinbefore mentioned it would be difficult

for me to believe that Congress intended for a bleached or purified wax to be admitted free of duty. One reason which brings me to this conclusion is the legislative history with reference to beeswax. When they wanted bleached beeswax made dutiable they made a special provision for it although "beeswax" was on the free list. The majority state that whenever Congress intended for a thing to be regarded in its crude or natural state they used some such term as "crude," etc., to indicate that fact. This was not true in the case of crude beeswax because, as I understand it, bleaching is the first step away from crudeness and adds nothing to the wax. After putting a duty of 25 per centum on "bleached beeswax" crude beeswax became free under the provisions for "Wax: Animal, vegetable, or mineral," and Congress was informed that in the Act of 1922 bleached beeswax was free under paragraph 1458. See Supplement to Summary of Tariff Information, 1929, p. 551.

The majority quote the following as a part of the information furnished by the Summary of Tariff Information, 1929:

Mineral wax to which stearic acid had been added was held dutiable at 20 per cent as a nonenumerated manufactured article under paragraph 1459 rather than free as a wax under paragraph 1693. (T. D. 41814.) [Decided 1926.]

This fact is a strong indication that the majority have arrived at the wrong result in the instant proceeding. Congress was told that if the foreign manufacturer added stearic acid to his montan wax he would have manufactured it away from montan wax into a nonenumerated manufactured article. Congress was told this in 1929. They did nothing about it, apparently contented with the manner in which the wax problem was being handled, so that if something was added to the wax, as in the instant case, it would be declared something more than a wax.

The interesting thing about it is that in T. D. 41814 the particular substance there involved was a mineral wax, such as montan wax, mixed with a small percentage of stearic acid. The stearic acid was added for the purpose of giving it "artificial hardness," the wax extracted from the mineral, ozocerite, being too soft for use in making wax figures. The court's holding that it was a nonenumerated manufactured article was based upon the fact that stearic acid added a new use and character to the merchandise.

The best example of stearic acid is beef tallow. Commercial stearic acid (stearin) is commonly a mixture of stearic [animal] and palmitic [vegetable] acid. (Webster's New International Dictionary, 2nd Edition, 1939.) In T. D. 41814 an animal or an animal and vegetable wax was added to a mineral wax, giving the so-called wax new uses and new characteristics, and Congress was informed that it had been held to be a nonenumerated manufactured article. Those

are substantially the facts in the instant case. Probably the majority had not observed that stearic acid was used for a purpose other than to bleach or purify the wax or it would not have cited this circumstance as an indication that wax such as that involved here was to be included in the free list paragraph.

The majority seem to think that the issue here is whether or not montan wax for free list purposes is limited to its crudest form. There is no issue on that question. The majority did not need to belabor this issue. The question is whether or not montan wax which had been processed by such revolutionary methods as was the article at bar would still be entitled to the same tariff treatment as montan wax either in its natural state or if bleached or refined.

The *Beiersdorf* case is cited by the majority only for the purpose of shedding light upon the question as to whether or not the free list provision should be limited to a natural wax. No one contends that it should be limited to a natural wax. It includes a synthetic wax if of the kind enumerated. It must be conceded by all that Congress intended that a wax might be bleached or purified without removing it from the free list status. But the case is no authority for holding that the instant merchandise is a free list wax. The issue in the *Beiersdorf* case was whether or not a wax made from wool grease, not being a natural wax, was included in the provision. We held that it was the intent of Congress that if the wax had the physical properties resembling beeswax and was a mixture of compounds containing carbon, hydrogen, and oxygen it was a wax, if waxlike in appearance and use. What has the *Beiersdorf* case to do with the holding that a material which has gone through numerous processes, catalytic and others, involving the addition of a calcium soap and beta butylene glycol, materials wholly foreign to wax, should still be regarded as a free list wax?

Last but not least, the majority have concluded (for insufficient reasons, I submit) that our holding in the *General Dyestuff Corporation* case was erroneous and that "the error should not be perpetuated by following it here."

For nearly six years, since the handing down of the *General Dyestuff* case, the trade has been informed as to what the law on this question is, and no doubt there has grown up a settled practice.

Settled practices should not be disturbed except for most compelling reasons. Such reasons do not maintain in the instant appeal. In *United States* v. *Basket Importing Co.*, 13 Ct. Cust. Appls. 98, T. D. 40941, cited with approval in *United States* v. *Bernard, Judae & Co.*, 13 Ct. Cust. Appls. 444, T. D. 41346, and elsewhere, this court reiterated in strong terms a correct procedure to follow in customs jurisprudence to the effect that the importance of uniformity of

**110**

decisions and of settled and well-understood administrative practice had always been stressed and that in a case involving such practice it should not be disturbed even though a "position, technically more correct, might be arrived at" upon new consideration.

The holding by the majority that the alleged error in our former holding should not now be *perpetuated* by following that holding here contradicts, and sets aside the effect of, our holding in the *Basket Importing* case and others. This is particularly unfortunate in the instant case since the trial court followed this decision and must now be reversed for so doing and for reasons which, to say the least, are not convincing.

For reasons above stated, I think the judgment should have been affirmed.